Joe N. BASORE and Ann Basore, Appellants and Cross-Respondents,

v.

David JOHNSON, Respondent and Cross-Appellant,

v.

Robert S. EDWARDS and Izella Edwards, Third Party Defendants,

v.

Leonard WELLS and Geneva Wells, Intervenors.

Nos. 13752, 13756.

Missouri Court of Appeals, Southern District, Division Two.

March 19, 1985.

Motion for Rehearing or Transfer Denied April 4, 1985.

Abe R. Paul, Pineville, and John Sims, Ruyle, Sims & Lampo, Neosho, for Joe N. Basore and Ann Basore.

Herbert Douglas, Douglas, Douglas & Johnson, Neosho, for David Johnson.

CROW, Judge.

These consolidated appeals arise from a suit by Joe N. Basore and his wife, Ann, ("plaintiffs") against David Johnson ("Johnson") concerning real estate in McDonald County. The assignments of error are easier stated after a synopsis of the significant facts.

By warranty deed executed April 3, 1962, Robert S. Edwards and his wife, Izella, ("the Edwardses") conveyed—using an intricate metes and bounds description—certain land to Jesse W. Barnett and his wife, Kathryn, ("the Barnetts"). For the purpose of this opinion, it is sufficient to refer to the land conveyed by that deed as "tract A." At the time the Edwardses conveyed tract A to the Barnetts, the Edwardses owned other land adjacent to tract A. This adjacent land is identified hereafter as "tract B." The deed provided, among other things, that "as a further part of the

consideration herein, the grantors covenant and agree with the grantees that no additional buildings shall be placed on [tract B]."

Fourteen years later, on July 8, 1976, the Edwardses, by warranty deed, conveyed tract B to Johnson. This deed made no mention of the covenant regarding tract B that appeared in the 1962 deed by which the Edwardses had conveyed tract A to the Barnetts.

Twenty-one months thereafter, by warranty deed executed April 24, 1978, the Barnetts conveyed tract A to plaintiffs. This deed was also silent regarding the tract B covenant in the 1962 deed from the Edwardses to the Barnetts.

In early 1979, Johnson erected a rectangular building, measuring 60.5 feet east and west by 41 feet north and south, along the north boundary of tract B. At that location, tract B abuts tract A, the north boundary of tract B being the south boundary of tract A.

A survey several months later by Howard L. Pratt, a licensed surveyor, revealed that Johnson's building, at its northwest corner, encroaches 4.06 feet on tract A, and at its northeast corner the building encroaches 5.99 feet on tract A.

Plaintiffs filed a two-count petition against Johnson. Count I prayed for the ejectment of Johnson from that portion of tract A occupied by Johnson's building, and for money damages. Count II alleged that tract B was subject to the covenant in the 1962 deed by which the Edwardses had conveyed tract A to the Barnetts. Johnson, according to Count II, violated that covenant by erecting the building. Count II prayed for an order commanding Johnson to remove the entire building or, in the alternative, an award of money damages.

Johnson answered plaintiffs' petition with sundry affirmative defenses that need not be recounted. Later, Johnson filed a third party petition against the Edwardses which, as amended, asserted that the Edwardses' deed to Johnson "warranted the title" to tract B, and that the Edwardses

were thus liable to Johnson for any damages assessed against him in favor of plaintiffs.

Plaintiffs, through discovery, acquired information that one Leonard Wells held a leasehold interest in Johnson's building. Consequently, plaintiffs moved to add Wells as a defendant. Wells and his wife, Eva, thereafter intervened, alleging that they had leased the building from Johnson "with option to purchase" and that they had made "substantial improvements thereon." Besides pleading several affirmative defenses to plaintiffs' claims, the Wellses filed a cross-claim against the Edwardses based on the warranty in the Edwardses' deed to Johnson, seeking damages from the Edwardses in the event plaintiffs prevailed against Johnson.

It is obvious, of course, that the Edwardses would not be liable to Johnson or the Wellses if plaintiffs prevailed against Johnson only on Count I of plaintiffs' petition, as the deed from the Edwardses to Johnson warranted title only to tract B, and Count I was based on encroachment onto tract A. The Edwardses would be liable to Johnson or the Wellses—if at all—only if plaintiffs prevailed against Johnson on Count II.

The Wellses also filed a cross-claim against Johnson, claiming that should plaintiffs prevail against Johnson, he would be liable to the Wellses for breach of a provision in the lease guaranteeing peaceable possession of the leased premises during the term thereof.

The Edwardses, answering Johnson's third party petition and the Wellses' cross-claim, pleaded, among other things, that the covenant in their 1962 deed to the Barnetts was not meant to be a restriction "running with the land," but merely an agreement between the parties to that deed.

When the cause was tried, the Wellses failed to appear. According to counsel for plaintiffs and counsel for Johnson, the Wellses' attorney had indicated earlier that they did not intend to participate in the trial.

Plaintiffs' evidence included a plat of the survey by Pratt showing the location of the boundary between tracts A and B at the site of the encroachment. This plat ("Exhibit 20") was the only proof of where that boundary lay. Exhibit 20 was received in evidence over Johnson's objection, as more fully appears *infra.*

The trial court entered judgment in favor of plaintiffs and against Johnson and the Wellses on Count I of plaintiffs' petition. Plaintiffs were awarded possession of that portion of tract A which, according to Exhibit 20, was encroached upon by the north side of Johnson's building. Plaintiffs were also awarded one dollar as nominal damages.

The trial court entered judgment in favor of Johnson and the Wellses, and against plaintiffs, on Count II of plaintiffs' petition, ruling that the covenant in the 1962 deed from the Edwardses to the Barnetts "is void and is not a covenant running with the land of defendant Johnson nor a charge or encumbrance thereon." Consistent with this ruling, the trial court found the issues in favor of the Edwardses and against Johnson on Johnson's third party petition, and in favor of the Edwardses on the Wellses' cross-claim against them.

Lastly, the trial court found for Johnson on the cross-claim against him by the Wellses, noting there had been no proof of the alleged lease on which the Wellses' claim was based.

Plaintiffs appeal (number 13,752) from that portion of the judgment adjudicating Count II of their petition against them. Johnson appeals (number 13,756) from that portion of the judgment adjudicating Count I of plaintiffs' petition against him.

\* \* \*

### Appeal number 13,756

█ We deal first with Johnson's appeal. His sole assignment of error is that the trial court should not have received Exhibit 20 in evidence, in that plaintiffs failed to prove that Pratt, in making his survey to establish the boundary between tracts A and B, began either (a) at an existent corner of the United States public land survey, as defined by § 60.115(1)–(2), RSMo Supp. 1979,[1] or (b) at a lost corner of the United States public land survey, § 60.115(3), which had been reestablished in accordance with § 60.225. Johnson asserts, and plaintiffs concede, that evidence of a survey which is not definitely shown to have commenced from a corner established by the government or, if lost, reestablished in accordance with statutes, is of no probative force. *Carroz v. Kaminiski,* 467 S.W.2d 871, 872 (Mo. banc 1971); *Roberts v. Harms,* 627 S.W.2d 924, 926[1] (Mo.App. 1982); *Probst v. Probst,* 595 S.W.2d 289, 290–91[2] (Mo.App.1979); *Cornelius v. Tubbesing,* 593 S.W.2d 609, 610[2] (Mo. App.1980); *Wells v. Elder,* 544 S.W.2d 258, 259[1] (Mo.App.1976).

Johnson's assignment of error requires careful study of Pratt's testimony and Exhibit 20.

As we understand his explanation, Pratt began his survey at a "found stone," which he identified as the northeast corner of the northwest quarter of the southwest fractional quarter of a certain section, township and range. Although Pratt referred to this as a "center" section marker, we fail to see how it could be, as the center of a standard section is the common point occupied by the southeast corner of the northwest quarter, the southwest corner of the northeast quarter, the northwest corner of the southeast quarter and the northeast corner of the southwest quarter.

Be that as it may, there was no testimony by Pratt establishing that this found stone was a monument, § 60.115(4), placed during the original government survey, § 60.115(6). All Pratt could say about this

---

**1.** Section 60.115, RSMo Supp.1979, was enacted as § 60.*005,* Laws 1979, pp. 251–52. The number in RSMo Supp.1979 (§ 60.*115* ) was evidently assigned by the Revisor of Statutes. Additionally, this section, as it appears in Laws 1979, contains paragraphs numbered 1 through 10. These paragraphs have been rearranged, and renumbered 1 through 8, in RSMo Supp.1979. All citations of statutes are to RSMo Supp.1979 unless otherwise indicated.

was, "Well, of course, they set a bunch of stones on corners, in days gone by."

There was likewise no showing that Pratt had examined the original government survey to ascertain whether the location of the found stone was in fact the corner Pratt believed it to be.

Pratt did testify that he found two "Government Land Office monuments" (hereafter referred to as "GLO monuments") on the state line between Missouri and Arkansas. The state line, according to Exhibit 20, lies less than 200 feet south of the boundary separating the north side of tract B from the south side of tract A. According to Pratt, he tied his survey to the found stone and the two GLO monuments on the state line.

Pratt described one of the GLO monuments on the state line as "a round head bolt set in concrete," and said he found it an inch beneath the pavement of a road that "goes right along the state line there." The second GLO monument on the state line is shown on Exhibit 20 as a half inch iron pin some 2,619 feet west of the bolt. Exhibit 20 identifies both monuments on the state line as corners of quarters of fractional quarters of sections in the same township and range.

In an effort to establish the admissibility of Exhibit 20, plaintiffs presented the testimony of another surveyor, James F. Gore, who was in charge of the surveying for Bella Vista Village, a 24,000 acre development in Arkansas that, according to Gore, "comes to the Missouri state line."

Gore disclosed that in surveying for Bella Vista in 1964 or 1965, he established the location of the state line in the area shown on Exhibit 20. Gore testified that the sections of land north and south of the state line are fractional sections; thus, "there are no section corners in the sense of a regular section" along the state line. Consequently, explained Gore, his survey established the state line from section corners to the south and to the north of the state line.

Gore said he had compared Exhibit 20 to the "U.S. Government survey," but he did not produce the latter at trial nor did he indicate whether it and Exhibit 20 agreed. He did, however, reveal that the two points identified by Pratt on Exhibit 20 as GLO monuments on the state line were in fact set during the survey Gore conducted for Bella Vista. These points, according to Gore, were established from "known" government corners north and south of the state line. Gore did not, however, identify any of these "known" government corners by section, township and range, nor did he say how he had verified that these "known" corners had indeed been established by the original government survey.

Asked about the found stone—the starting point of Pratt's survey—Gore responded that its location was "established or found" by a surveyor named Letz during a 1948 survey. Gore based this testimony on a copy of the plat of Letz's survey. There was no evidence, however, as to whether the location was identified by Letz as an existent government corner or a reestablished lost corner, or whether, in 1948, Letz found no monument at that point and placed the stone himself, attempting to reestablish a lost corner.

Plaintiffs' evidence thus failed to demonstrate that the found stone was an existent government corner, § 60.115(2). Furthermore, if it be assumed that the found stone represented an attempt by someone, perhaps Letz, to reestablish a lost government corner, there is no evidence as to how the person who placed that stone determined where it should be put. Absent such evidence, the found stone does not qualify as a statutorily reestablished government corner.

Regarding the two GLO monuments on the state line, it is clear from Gore's testimony that they were not set during the original government survey, but were instead set during Gore's Bella Vista survey in the 1960's. Gore confirmed that at the time of that survey, no monuments from the original government survey could be found along the portion of the state line

shown on Exhibit 20. The two GLO monuments are therefore, at best, reestablished lost corners. Consequently, Exhibit 20 has probative value only if at least one of the two GLO monuments meets the criteria of § 60.225 for a reestablished government corner.

Gore testified that in placing the two GLO monuments on the state line, he followed the procedure in paragraphs 3 and 4 of § 60.225,[2] except that the two monuments do not mark "lost standard corners," inasmuch as the sections abutting the state line are fractional sections, thus "there are no standard corners." Gore added that for the same reason, there were no section and quarter-section corners on the state line. He insisted, however, that his method complied with paragraphs 3 and 4.

Despite Gore's avowed effort to comply with § 60.225, we are persuaded that neither of the two GLO monuments on the state line is shown, by the record before us, to have been reestablished in compliance with the statute.

Neither Pratt nor Gore identified any "known" government corner that was used as a reference point in placing the GLO monuments, nor was there any testimony from either of them as to how it was ascertained that any such corner was in fact a government corner. Gore simply said, "[T]here were original government corners east and west or north and south of here that went into the reestablishment of these points."

In *Cordell v. Sanders*, 331 Mo. 84, 52 S.W.2d 834 (1932), two surveyors testified they began their surveys from the southwest corner of a particular section. They admitted, however, that the original corner monument could not be found and that they had assumed their starting point was the section corner because of certain roads

and fences. Observing that this testimony was a conclusion of fact rather than evidence thereof, the Supreme Court said, "A surveyor's testimony is never receivable except in connection with the data from which he surveys, and if he runs lines they are of no value unless the data are established from which they are run, and those must be distinctly proven, or there is nothing to enable any one to judge what is the proper result." 52 S.W.2d at 839. The surveys were held to be without probative force.

*Cordell* was cited and followed in *Pioneer Cooperage Co. v. Bland,* 228 Mo.App. 994, 75 S.W.2d 431 (1934), where there was no proof that the beginning point of the surveys was an established corner. *Klinhart v. Mueller,* 166 S.W.2d 519, 523 (Mo. 1942); *Roberts,* 627 S.W.2d 924, 926[2], and *Barnhart v. Ripka,* 297 S.W.2d 787, 791–92[9] (Mo.App.1956), apply the same rule.

We accordingly hold that inasmuch as there was no identification of any government corner—original or reestablished—used by Gore in locating the points where he placed the GLO monuments on the state line, and no evidence explaining how he ascertained that his beginning points, whatever they were, were indeed government corners, the evidence failed to establish that either of the GLO monuments shown on Exhibit 20 meets the criteria for a reestablished government corner. § 60.225. Exhibit 20 was therefore without probative value, and as it was the only evidence showing the boundary between tracts A and B, there was a failure of proof that Johnson's building encroaches on tract A.

That being so, the portion of the judgment adjudicating Count I of plaintiffs' petition in their favor must be reversed and

---

**2.** Section 60.225 provides, *inter alia:*

"...

(3) Lost standard corners will be reestablished on a standard or correction line by single proportionate measurement on the line connecting the nearest identified standard or closing corners on opposite sides of the lost corner or corners, as the case may be;

(4) All lost section and quarter-section corners on the township boundary lines will be reestablished by single proportionate measurement between the nearest existent corners on opposite sides of the lost corner; ...."

the cause must be remanded for a new trial on that count. *Roberts*, 627 S.W.2d 924; *Probst*, 595 S.W.2d 289; *Burke v. Colley*, 495 S.W.2d 699 (Mo.App.1973).

\* \* \*

### Appeal number 13,752

Plaintiffs maintain the trial court erred in holding that the covenant that no additional buildings shall be placed on tract B was not enforceable against Johnson. This covenant, it will be remembered, appeared only in the 1962 deed by which the Edwardses conveyed tract A to the Barnetts.

The trial court ruled that Johnson had neither actual nor constructive notice of the covenant. There was no evidence that Johnson had actual notice, and plaintiffs do not contend otherwise. Instead, plaintiffs rely on the fact that the deed from the Edwardses to the Barnetts was recorded April 25, 1962, in the office of the Recorder of Deeds of McDonald County. Plaintiffs, citing § 442.390, RSMo 1978,[3] insist that by reason of the recording, Johnson had constructive notice of the covenant when he acquired tract B in 1976.

It is established by ancient, but viable, authority that a purchaser is bound with constructive notice of all recorded instruments and the recitals therein lying within his chain of title, but a deed or instrument lying outside his chain of title imparts no notice to him. *Gross v. Watts*, 206 Mo. 373, 104 S.W. 30, 36 (1907); *Tydings v. Pitcher*, 82 Mo. 379, 384 (1884). Inasmuch as the 1962 deed from the Edwardses to the Barnetts conveyed only tract A, such deed was no link in the chain of title to tract B. The chain of title to tract B, in reverse chronological order, led from Johnson back to the Edwardses and thence to their grantor. The 1962 deed from the Edwardses to the Barnetts, conveying only tract A, lay nowhere in the line of ownership to tract B. The trial court was correct in ruling that Johnson was not charged with constructive notice of the covenant on which plaintiffs based Count II of their petition.

In upholding the trial court on this ruling, we do not overlook *King v. St. Louis Union Trust Co.*, 226 Mo. 351, 126 S.W. 415 (1910), in which building restrictions contained in a recorded deed by which the developer of a city subdivision conveyed certain lots to one grantee were held binding on a party who, at a later time, acquired different lots in the same subdivision from the same developer. In *King*, unlike the instant case, certain of the restrictions were shown on the recorded plat of the subdivision and, in addition, the deed conveying the second group of lots provided that they were "subject to all restrictions now of record against same." 126 S.W. at 418. None of the circumstances in *King* are present in the case before us.

We are also mindful of *Harp v. Parker*, 278 Ky. 78, 128 S.W.2d 211 (1939), and *Bishop v. Rueff*, 619 S.W.2d 718 (Ky.Ct. App.1981), the rationale of which, if applied to the instant case, would hold that because the Edwardses owned tract B at the time they conveyed tract A to the Barnetts in 1962, Johnson, before buying tract B in 1976, should have examined the record of that 1962 conveyance to see whether anything therein purported to affect tract B. *Bishop* would apparently impose this duty on Johnson even while recognizing that the 1962 deed is not in his chain of title. 619 S.W.2d at 720.

Nothing we have found persuades us that Missouri law imposes such a requirement. Indeed, Judge Howerton's concurring opinion in *Bishop*, 619 S.W.2d at 722–23, points out the onerous burden and excessive expense such a requirement could impose on a title examination. Judge Howerton observes that if a landowner sells some of his land to one buyer and they agree that the land retained by the seller

---

3. Section 442.390, RSMo 1978, provides:
   "Every such instrument in writing, certified and recorded in the manner herein prescribed, shall, from time of filing the same with the recorder for record, impart notice to all persons of the contents thereof and all subsequent purchasers and mortgagees shall be deemed, in law and equity, to purchase with notice."

shall be subject to certain restrictions, it is far more reasonable for the buyer to require the seller to record a separate instrument imposing the restrictions on the retained land, thereby placing the restrictions squarely in the chain of title to subsequent buyers of the retained land, than it is to require those subsequent buyers, at their peril, to search out and examine all earlier deeds by the landowner to buyers of other portions of his land. *Id.* at 723.

■ If buyers of real estate in Missouri are to be charged with constructive notice of restrictions in recorded conveyances outside their chain of title under circumstances such as those in the case before us, it is for the Supreme Court of Missouri, not us, to so hold. As noted earlier, *Gross*, 104 S.W. 30, and *Tydings*, 82 Mo. 379, hold that a recorded deed or instrument lying outside a purchaser's chain of title imparts no notice to him. We adhere to that principle.

As Johnson had neither actual nor constructive notice of the covenant, it was unenforceable against him. *Weber v. Les Petite Academies*, 548 S.W.2d 847, 851–52[8] (Mo.App.1976); *Poage v. Quincy, O. & K.C.R. Co.*, 23 S.W.2d 221, 225[4] (Mo. App.1930).

The trial court found the covenant unenforceable for a second reason, i.e., that it is in restraint of trade and against public policy, and thereby void. Because we have upheld the trial court's decision that the covenant is unenforceable against Johnson because he had neither actual nor constructive notice thereof, we need not address the second ground relied on by the trial court.

\* \* \*

The judgment is affirmed in all respects except that portion adjudicating Count I of plaintiffs' petition, which is reversed. The cause is remanded for a new trial on Count I of plaintiffs' petition only.

HOGAN, P.J., and MAUS, J., concur.

PREWITT, C.J., concurs in number 13756 and concurs in result in number 13752 in separate opinion.

PREWITT, Chief Judge.

I agree with the majority opinion on appeal No. 13756. Although I see some considerations favoring its reasoning on appeal No. 13752, I respectfully disagree with that reasoning.

I believe that § 442.390, RSMo 1978, imparts notice to Johnson of the contents of the deed from the Edwardses to the Barnetts. The deed conveyed a "negative easement" in tract B. See *Tracy v. Klausmeyer*, 305 S.W.2d 84, 88 (Mo.App.1957). That deed might not be a "link" in the "chain" of documents by which Johnson acquired his interest in tract B, but it was in his "chain of title" as a document by the record owners affecting that tract. The indexing system required for a recorder of deeds allows a searcher to find the deed under the then record owners' names. See §§ 59.440 and 59.470, RSMo 1978.

The Missouri cases relied on in the principal opinion involved documents recorded while the grantor did not have record title. In that situation a searcher might not find the deeds as the index would be checked for the name of the record owner during the period of that record ownership.

There are factual differences here with *King v. St. Louis Union Trust Co.*, 226 Mo. 351, 126 S.W. 415 (1910), but in considering what was within the "chain of title", the court there concludes that while record title is in a grantor, "it is clear that a purchaser is affected with constructive notice of all duly recorded conveyances by his grantor affecting the latter's title". 126 S.W. at 419–420. See also Scurlock, Missouri Law of Land Agreements Which Run with the Fee, 23 K.C.L.Rev. 3, 49 (1954); *Kuhn v. Saum*, 316 Mo. 805, 291 S.W. 104, 106 (1926).

I believe *Harp v. Parker*, 278 Ky. 78, 128 S.W.2d 211 (1939), and *Bishop v. Rueff*, 619 S.W.2d 718 (Ky.Ct.App.1981), referred to in the principal opinion, reached the correct result in finding notice to subsequent owners of a deed by a record owner restricting land retained. That appears to be the majority view. See Annot., 16 A.L.R. 1013 (1922); 20 Am.Jur.2d, Covenants, Condi-

tions, and Restrictions, § 309 at pp. 872–873. See also *Jones v. Lambert,* 298 S.W.2d 297 (Ky.1957); *McLean v. Thurman,* 273 S.W.2d 825 (Ky.1954); *Guillette v. Daly Dry Wall,* 367 Mass. 355, 325 N.E.2d 572 (1975); *Beekman v. Schirmer,* 239 Mass. 265, 132 N.E. 45 (1921); *Howland v. Andrus,* 80 N.J.Eq. 276, 83 A. 982 (1912), rev'd on other grounds, 81 N.J.Eq. 175, 86 A. 391 (1913); *DiCarlo v. Cooney,* 282 Pa.Super. 477, 423 A.2d 3 (1980); *Painter v. MacDonald,* 427 S.W.2d 127 (Tex.Civ.App.1968), rev'd on other grounds, 441 S.W.2d 179 (Tex.1969).

However, I believe that the result the majority opinion reached was correct. Restrictions in derogation of the fee are not favored. *Hall v. American Oil Co.,* 504 S.W.2d 313, 317 (Mo.App.1973). Applying the principles set forth in *Hall,* 504 S.W.2d at 317–319, and the cases there cited, I conclude that the restriction here was not enforceable against Johnson. For that reason I concur in the result.